COLUMBUS BAR ASSOCIATION *v.* GUELI.

[Cite as *Columbus Bar Assn. v. Gueli,* 119
Ohio St.3d 434, 2008-Ohio-4786.]

(No. 2008–0485—Submitted May 6, 2008—Decided September 25, 2008.)

---

**Per Curiam.**

{¶ 1} Respondent, Christopher Gueli, Attorney Registration No. 0064873, last registration address in Columbus, Ohio, was admitted to the practice of law in Ohio in 1995. The Board of Commissioners on Grievances and Discipline has recommended that we permanently disbar respondent, based on findings that he violated an array of ethical duties owed to numerous clients. We agree that respondent violated the Code of Professional Responsibility as found by the board and that disbarment is appropriate.

{¶ 2} Relator, Columbus Bar Association, charged respondent with nine counts of professional misconduct, alleging numerous violations of the Disciplinary Rules as well as failure to cooperate in investigations of this misconduct in violation of Gov.Bar R. V(4)(G). Relator served respondent notice of the complaint, as amended, at his place of employment by certified mail and hand-delivery. Respondent did not answer.

{¶ 3} Relator moved for default under Gov.Bar R. V(6)(F). A panel of the board dismissed Count III, but found that the remaining eight counts had been proved at least in part by clear and convincing evidence. Finding that respondent had engaged in a pervasive pattern of misconduct, the panel recommended his permanent disbarment. The board adopted the panel's findings and recommendation.

## I. Misconduct

{¶ 4} As alleged in Count IX, which recounts respondent's victimization of multiple clients, respondent has stolen from, deceived, neglected, and abandoned clients one after another. As alleged in Count VI, he has undertaken the representation of plaintiffs in their pursuit of a wrongful-death claim against his own brother, endangering the interests of the decedent's children. The other improprieties alleged in Counts I, II, IV, V, VII, and VIII have also been proved with sworn or documentary proof as required by Gov.Bar R. V(6)(F). We begin

our review with the very worst of respondent's misdeeds and then take the counts in order.

### A. Count IX—Grievances for Misappropriation of Fees from Multiple Clients

{¶ 5} During 2006 and 2007, respondent agreed to represent 13 separate clients in a variety of proceedings, mostly divorce and other domestic-relations disputes but also in a criminal matter and on a charge of contempt of court. These clients paid fees of varying amounts, for a total of more than $15,000. In each case, respondent failed to complete the work for which he had been paid and then abandoned the clients without notice.

{¶ 6} In addition to the money he kept despite doing nothing, respondent also retained $1,500 that he was to distribute to the ex-spouse of one of these clients from the sale of a house. Respondent routinely skipped court dates, stranding his clients, and ignored his clients' attempts to contact him. He has now apparently moved out of state.

{¶ 7} With his theft and flagrant disregard of clients' interests, respondent violated DR 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects on a lawyer's fitness to practice law), 2–106(A) (prohibiting a lawyer from collecting an excessive fee), 7–101(A)(3) (prohibiting a lawyer from intentionally damaging a client during professional employment), 9–102(B)(3) (requiring a lawyer to maintain records of all funds and appropriately account to client), and 9–102(B)(4) (failing to promptly deliver property to which the client is entitled).

### B. Count VI—The Barnhill Estate Grievances

{¶ 8} On April 20, 2002, John Gueli, respondent's half-brother, fell asleep at the wheel of his van, causing it to leave the highway and flip over several times. One of his passengers, James V. Barnhill Jr., was killed. John Gueli's wife, who was also injured in the accident, was the decedent's sister. The decedent was unmarried at the time of his death, but had three minor children.

{¶ 9} In October 2002, as counsel for the estate, respondent asked the probate court to authorize the decedent's father, James V. Barnhill Sr., to administer the estate, giving notice on the application that the administrator anticipated a wrongful-death action. There is some indication that the decedent's father and other family members approved of respondent's serving both as counsel for the estate and for plaintiffs in the wrongful-death suit against respondent's own brother. During respondent's involvement, however, no one moved for the appointment of a guardian to protect the interests of the decedent's underage children.

{¶ 10} Respondent represented the administrator of the estate and also acted as plaintiffs' counsel from October 2002 until July 2005. During that time, the conflicting interests of respondent, his brother, and the Barnhill family had prompted Franklin County Probate Judge Lawrence Belskis to (1) appoint a master commissioner to investigate the matter and (2) enlist the aid of the successor administrator, appointed after the decedent's father died, in providing the court with information on respondent's management of the estate in light of those conflicting interests. Upon review of respondent's conduct, Judge Belskis filed a grievance against respondent. The mother of one of the decedent's children also filed a grievance.

1. Improprieties in Administering the Barnhill Estate

{¶ 11} Respondent jeopardized the interests of beneficiaries and creditors in administering the estate of James V. Barnhill Jr. The application to administer the estate, which showed assets of approximately $64,000, listed a claim against the estate by decedent's father of over $9,000. Respondent did not obtain the required probate court approval for this claim, rendering it uncollectible.

{¶ 12} In April 2003, respondent filed the inventory and appraisal and a schedule of assets for the estate. The inventory and appraisal summary listed tangible personal property valued at $1,102.53; however, the schedule of assets listed no tangible personal property. The schedule of assets also listed a Fifth Third Bank account containing $10,102.53; the inventory and appraisal did not.

{¶ 13} In January 2004, respondent filed a schedule of assets and an amended inventory and appraisal, deleting without explanation the $1,102.53 in tangible personal property and the reference to the Fifth Third Bank account. Respondent failed to list in either the original or the amended inventory and appraisal (1) an IRA payable to the decedent's estate, (2) the balance of a savings account shown as closed in the estate financial records, and (3) state and federal tax refunds due at the date of death. Respondent also did not list any assets such as personal effects, vehicles, or final wages due.

{¶ 14} Respondent filed an action to sell some rental property owned by the decedent. The sale closed in April 2004 with net proceeds of approximately $42,700. Respondent did not, however, obtain probate court approval for the sale before the closing.

{¶ 15} Respondent never opened a checking account for the estate, using instead a joint account in the names of the decedent's father and sister for receipts and disbursements. In July 2004, he filed the administrator's "1st Partial Fiduciary's Account." He failed to account in this filing for two years of receipts and disbursements from the estate, all completed through the joint checking account.

{¶ 16} Respondent also did nothing to collect the $9,930.34 balance of the decedent's IRA. He never obtained a taxpayer identification number for the estate and filed no federal, state, or city tax returns. As of November 2005, respondent still had not fully documented the sale of the rental property, precluding the successor administrator from closing the estate. In the end, respondent's mismanagement unnecessarily delayed distributions and cost the estate extra administrator fees, court costs, interest income, and potential tax penalties.

2. Respondent's Conflict and the Consequences

{¶ 17} Respondent also jeopardized the interests of the decedent's children by concurrently representing the adverse interests of the decedent's family and the respondent's own brother. Within days of the accident, Grange Insurance, John Gueli's carrier, began sending letters to the estate, offering medical payments to assist with medical and funeral bills. In February 2003, respondent wrote to Grange, forbidding further contact with the estate's administrator and directing that all correspondence be sent only to respondent. Despite repeated requests, Grange was never able to obtain from the administrator or respondent information as to the decedent's medical bills or wages at the time of death. Finally in early August 2003, after speaking with respondent, Grange sent a check for $250,000, which was the policy limit, and a request for release. Respondent accepted the check and directed the administrator to sign the release, waiving all claims of the estate against Grange and respondent's brother.

{¶ 18} Respondent then tried to charge the estate $37,500 in attorney fees for settling with Grange. Judge Belskis, who had already appointed a master commissioner to investigate the conflict, denied the claim. Respondent at some point assured Judge Belskis, the probate master commissioner, and the successor administrator that Disciplinary Counsel had advised him that his representation posed no ethical problems; however, he never produced any evidence to this effect.

{¶ 19} Underscoring the divided loyalties at stake, respondent apparently took no action beyond accepting the $250,000 check from Grange to recover assets from his brother on behalf of the estate. According to the probate master commissioner, respondent's brother had considerable real estate holdings and owned part of a family business. Nothing in respondent's case file, however, suggested that he considered investigating and pursuing these assets.

{¶ 20} Without any apparent reason for the delay, respondent did not seek probate court approval for the Grange settlement and distribution of the proceeds until July 6, 2004, nearly a year after the settlement. The relevant statute of limitations had already expired by that time. Respondent then continued to hold

the $250,000, putting off the successor administrator's demands for the money until August 2005. The proceeds were in respondent's client trust account for two years, earning only $634.89 in interest.

### 3. Violations

{¶ 21} Respondent badly mishandled the Barnhill estate and, despite a patent conflict of interest, undertook the Barnhill wrongful-death claim, using his position to protect his brother at the expense of the decedent's children. He thereby violated DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(5), 1–102(A)(6), 6–101(A)(1) (prohibiting a lawyer from handling a legal matter he or she is not competent to handle), 6–101(A)(2) (prohibiting a lawyer from handling a legal matter without adequate preparation), and 6–101(A)(3) (prohibiting the neglect of an entrusted legal matter).

{¶ 22} Respondent had no records that justified charging the Barnhill estate $37,500 in attorney fees. We therefore also find him in violation of DR 9–102(B)(3). Moreover, by retaining proceeds from the Grange settlement, respondent violated DR 9–102(B)(4).

{¶ 23} With his conflict of interest relative to the Barnhill wrongful-death claim, respondent violated DR 5–101(A)(1) (prohibiting a lawyer, except with consent after full disclosure of attendant risks, from accepting or continuing employment when the lawyer's professional judgment on the client's behalf may be affected by the lawyer's personal or financial interests), 5–105(A) (prohibiting a lawyer from representing clients with conflicting interests except when it is obvious that the lawyer can adequately represent the interest of each, and each client consents after full disclosure of possible effect of multiple representation on lawyer's exercise of professional judgment), and 7–102(A)(3) (prohibiting a lawyer from failing to disclose what the lawyer is required by law to reveal).

### C. Count I—The Boysaw Grievance

{¶ 24} Respondent represented Selina J. Boysaw in matters relating to her divorce from May 2002 until she discharged him in January 2005. In her grievance, Boysaw alleged various lapses in respondent's performance, including his failure to remit proceeds from the sale of real estate and to return her case file on request. Respondent appeared at a deposition during relator's investigation and disputed Boysaw's claims, explaining to the panel's satisfaction all but the failure to promptly return her file.

{¶ 25} During the deposition, respondent produced records of his accounts receivable for Boysaw and their fee agreement. Upon relator's request for further documentation of his fee, respondent promised to produce his client trust-

account records for the period he represented her. Relator continued the deposition for this purpose, but respondent thereafter failed to appear in response to subpoenas and never produced the requested records.

{¶ 26} Respondent violated DR 9–102(B)(4) by failing to return Boysaw's file upon his discharge. He also violated Gov.Bar R. V(4)(G) by ignoring relator's request for the production of documents.

### D. Count II—The Miller Grievance

{¶ 27} In July 2005, Nina J. Miller retained respondent to represent her in a divorce and paid him $1,500. A few days later, she instructed respondent not to pursue the matter. When Miller did not receive a refund of any unearned fees despite repeated requests, she filed a grievance against respondent.

{¶ 28} Respondent appeared at a deposition during relator's investigation and disputed Miller's claim. He testified that he still held an unused $412 balance from her retainer in his client trust account because he had thought the case was still open. Respondent explained that Miller had wavered on the divorce, but only because of pressure from her husband, and that she had most recently elected to proceed.

{¶ 29} Respondent produced his client's file during the deposition. He also promised to produce additional records to document his work in her case. Relator continued the deposition for this purpose, but respondent thereafter failed to appear in response to subpoena and never produced the requested documentation.

{¶ 30} By ignoring relator's request for the production of documents, respondent violated Gov.Bar R. V(4)(G).

### E. Count IV—The Cullison Grievance

{¶ 31} In June 2004, Cheryl M. Cullison paid respondent $712.50 to prepare a shared-parenting plan. Respondent knew that Cullison needed the plan by mid-August 2004 so that she could enroll her children in school; however, he did not submit the plan for court approval until September 2004 and did not obtain approval until November 2004. Over one year later, Cullison learned that child-support authorities were pursuing her husband for arrearages that respondent had failed to address in the plan.

{¶ 32} By failing to conscientiously complete or file the shared-parenting agreement for Cullison, respondent violated DR 6–101(A)(3).

### F. Count V—The Farley Grievance

{¶ 33} Mackie and Carolyn Farley retained respondent in July 2004 to defend them against a lawsuit by the victim of a dog attack. The Farleys paid

respondent $1,300 and gave him all the papers they had received from the plaintiff's lawyer. Respondent assured them he was taking care of their defense.

{¶ 34} Respondent did not answer the pending complaint or even file an appearance. He ignored two letters offering to settle the dispute. At some point, respondent also appeared at the courthouse with the Farleys, left them waiting outside, and then told them that the hearing had been postponed. He later billed the Farleys another $100.

{¶ 35} Respondent met with the Farleys and claimed to have done some research, but apparently did nothing else in their case. He never accounted to them for their fees or refunded any of their money. In February 2006, the court granted a default judgment against the Farleys for $103,095, plus costs. The Farleys' bank account was seized, their wages were garnished, and liens were placed on their home.

{¶ 36} With his false assurances and pretense of a postponed hearing, respondent violated DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6). Despite being paid $1,400, respondent did not even file an answer for the Farleys, causing a default judgment to be entered against them, and thereby violated DR 2–106(A) and 7–101(A)(3). By failing to account for his fees, respondent violated DR 9–102(B)(3).

### G. Count VII—The Ogg Grievance

{¶ 37} Kimberly Ogg hired respondent in November 2002 to represent her in a divorce. He promised to prevent the impending transfer of her family's home to her husband. Ogg paid respondent at least $1,500 of the $2,500 fee he quoted to complete work in the case.

{¶ 38} Respondent represented Ogg at a contempt hearing, a deposition, and at a final divorce hearing. The parties reached an agreement, and the divorce was finalized in July 2003. Though Ogg at that time owed respondent no more than $1,000 in fees, respondent sent her a bill for $2,200.

{¶ 39} As part of the divorce settlement, Ogg's ex-husband paid her $25,000 as her share of the equity in the family home and made the check payable to respondent and Ogg jointly. Respondent had Ogg endorse the check to him with the implausible explanation that he was to pay her the funds in installments because the judge feared that she would flee the jurisdiction. Respondent paid Ogg just $7,500. Later that day, respondent told Ogg to tear up the check, which she did, relying on his "explanation" that her husband's check had not yet cleared.

{¶ 40} Several weeks later, respondent sent Ogg a check for $7,000, promising to pay the remaining $18,000 "soon." Respondent kept Ogg's money for the next three years and then claimed that Ogg owed him $15,000 for her divorce.

Respondent has never accounted for Ogg's money, and she has since had to rely on Southeastern Ohio Legal Services for assistance in retrieving her money.

{¶ 41} Respondent lied about and never returned all of Ogg's $25,000. He thereby violated DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 2–106(A), 7–101(A)(3), 9–102(B)(3), and 9–102(B)(4).

## H. Count VIII—The Foster Grievance

{¶ 42} In March 2002, Saundra K. Foster and her husband consulted respondent about filing a medical-malpractice claim concerning a procedure her husband had had in 2001 and his follow-up medical care through March 2002. Respondent promised to file the action and obtain an expert opinion to support their case. He did not file the action for more than two years and in the interim evaded the Fosters' inquiries as to why he had not.

{¶ 43} Not until July 2004 did respondent finally file the Foster action in court. Two more years passed. He eventually told the Fosters that they had a court date on July 31, 2006. The Fosters appeared on that day, but respondent did not. The Fosters then learned from the court that their case had been dismissed over one year before. When they arrived home, they found a voicemail message from respondent that the trial had been postponed because respondent had to be out of town.

{¶ 44} The Fosters asked respondent for their case file and hired another lawyer to pursue their case and to sue respondent for malpractice. In reviewing the case file as returned by respondent, the new lawyer saw that documents and material evidence were missing. Respondent never answered when his successor tried to reclaim missing portions of the Foster file.

{¶ 45} The Fosters obtained a default judgment against respondent in their malpractice suit. In the course of that proceeding, the Fosters discovered that respondent had transferred his property interests in his home and law office to members of his family to stop the Fosters from collecting on the judgment.

{¶ 46} Respondent lied to his clients in violation of DR 1–102(A)(4), 1–102(A)(5), and 1–102(A)(6). He did not conscientiously pursue their medical-malpractice action in violation of DR 6–101(A)(2), 6–101(A)(3), and 7–101(A)(3). He also violated DR 9–102(B)(4) by failing to return client property.

## I. Wholesale Violations of Gov.Bar R. V(4)(G)

{¶ 47} During the deposition discussed in Count II, respondent also answered questions about the allegations that Boysaw raised in Count I. But after that proceeding, respondent did not respond to relator's investigative efforts, ignoring letters of inquiry, subpoenas seeking his deposition testimony, and requests for

the production of documents. We find that respondent thereby violated Gov.Bar R. V(4)(G).

## II. Sanction

{¶ 48} Repeated misconduct of this magnitude and variety demands only one result. Respondent is permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

---

Bruce A. Campbell, Bar Counsel, and David S. Bloomfield and Edward W. Erfurt III, for relator.